IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLARENE COCHRANE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 C 2906 |
| vs. ) | Magistrate Judge Sidney I. Schenkier |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Clarene Cochrane has filed a motion seeking reversal and/or remand of a determination by the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g), 416(I), and 423(d). The Commissioner, in turn, has filed a motion seeking summary affirmance of that same determination. For the reasons set forth below, the Court grants Ms. Cochrane's motion to remand the Commissioner's determination denying her DIB benefits (doc. # 34) and denies the Commissioner's motion for summary affirmance (doc. # 38).

### I.

The standards for review of an appeal from the Social Security Administration denying disability benefits are well-established. To establish a "disability" under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

---

[1] On January 7, 2009, the case was reassigned to this Court for all proceedings, including the entry of final judgment, by consent of all the parties and pursuant to 28 U.S.C. § 636(c)(1) (doc. ## 24, 29).

42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that her impairments prevent her from performing not only past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The regulations under the Social Security Act set forth a five-step process to determine whether a person is disabled. 20 C.F.R. § 404.1520(a)(4). Under these regulations, an administrative law judge ("ALJ") must consider: (1) whether the claimant presently has substantial, gainful employment; (2) whether the claimant's alleged impairment or combination of alleged impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) the specific impairments that are listed in the appendix to the regulations as severe enough to preclude gainful employment; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1520(b)-(f); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either step three or step five. *See* 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than step three precludes a finding that the claimant is disabled. *Young*, 957 F.2d at 388. The claimant bears the burden of proof at steps one through and including four. In cases of severe impairment, the ALJ's analysis typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(e). This RFC is used for purposes of steps four and five to determine whether the claimant may work in her previous occupations. *Id.*

At step five, the burden shifts to the Commissioner, who must "provid[e] evidence that demonstrates that other work exists in significant numbers in the national economy that [the

claimant] can do, given [her] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). If a claimant's RFC allows her to perform jobs that exist in significant numbers in the national economy, then the Commissioner will determine that the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision and use of the five-step process, courts may not decide facts anew, reweigh evidence or substitute their judgment for the articulated judgment of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The reviewing court will uphold the Commissioner's decision if it is supported by "substantial evidence," and is free of legal error. 42 U.S.C. § 405(g) (2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). If conflicting evidence would allow reasonable minds to differ, the responsibility to determine disability belongs to the Commissioner (and ALJ, by extension), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible).

That said, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron*, 19 F.3d at 334.

Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ must state the reasons he or she accepted or rejected "entire lines of evidence." *Id.* at 333; *see also Young*, 957 F.2d at 393 (in order for there to be a meaningful appellate review, the ALJ must articulate a reason for rejecting evidence "within reasonable limits"). The written decision must include specific reasons that explain the ALJ's decision, so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence or was "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

## II.

In the backdrop of these legal principles, we turn to a summary of the administrative record.

### A.

Ms. Cochrane was born on July 14, 1956 (Record ("R.") 18). She completed high school and attended two years of college (R. 81). She is married and she has three children (R. 296).

Ms. Cochrane has had past relevant work experience as a correspondence support clerk for First Chicago ("First Chicago") Bank, now owned by Chase Manhattan Bank, in Chicago, Illinois (R. 64; 94-96; 299). She worked for First Chicago for approximately 10 years, from 1995 until April 2005 and into 2006, serving in the support clerk position for the last 6 years of her employment (*Id.*). After she became ill and needed gastric bypass surgery on or about December 1, 2004, she was on leave until February 6, 2005 (R. 68). However, after calling in sick two or three times between February and early April 2005, Ms. Cochrane testified that she was terminated (R. 306-07). For a brief period of time thereafter, she worked as an assistant in her church, where her husband was a pastor, but when that position became a volunteer position, she quit (R. 307-308).

On April 22, 2005, three days after losing her job at First Chicago, Ms. Cochrane applied for DIB (R. 59-63), alleging an onset date of December 1, 2004 (R. 59). On August 16, 2005, Ms. Cochrane's claim for benefits was denied initially (R. 44-47); it was also denied after reconsideration on December 19, 2005 (R. 30-31, 40-43). On January 17, 2006, Ms. Cochrane requested a hearing before an ALJ (R. 38-39), which was granted on December 18, 2006 (R. 20). On January 11, 2007, Ms. Cochrane – who was represented by counsel – appeared before an ALJ and testified (R. 290-331).

In her DIB application, Ms. Cochrane claimed that she was disabled and no longer able to work due to the impairment of diabetes mellitus. On review of her application, the SSA rejected her claim for DIB, listing her claims of impairment under the general notation, "Diabetes with complications" (R. 48), and on reconsideration with the note: "Diabetes with complications LOTS OF PHYSICAL PAIN" (R. 43) (emphasis in original). These records reflect that, at the time of her application, Ms. Cochrane's only claimed impairment was diabetes and with the complication of pain.

Prior to her administrative hearing on January 11, 2007, to review the SSA's initial and reconsidered denials of DIB, Ms. Cochrane retained an attorney who provided the SSA with additional medical evidence covering the period April through December 2006. These medical records, summarized by Ms. Cochrane's attorney in a letter dated January 9, 2007, were presented prior to the administrative hearing and made part of the record on review (R. 142-46). Those records indicate that Ms. Cochrane has suffered from the following additional impairments: hernia (repaired by surgery) (R. 285); left shoulder adhesive capsulitis (R. 281); left rotator cuff dysfunction; fibromyalgia; chronic pain, carpal tunnel syndrome (moderate bilateral greater in the right hand than

5

in the left) (R. 259); and polyneuropathy (R. 259). Ms. Cochrane additionally claims the following impairments: diabetic retinopathy[2] (R. 200); glaucoma, open angle (R. 220); headaches (R. 163); hyperthyroidism (R. 168); gastric bypass surgery (R. 195); liver steatosis (fatty change) (R. 195); obesity (R. 184); and status post surgery for strabismus (deviation of one eye from parallelism with the other) (R. 190). The attorney's summary of the evidence, as well as the underlying medical reports, was presented to the ALJ prior to the administrative hearing for consideration.

We review the evidence identified by Ms. Cochrane's attorney in his letter of January 9, 2007, discussed below in subpart B. We will then follow in subpart C with remaining additional record evidence relied on by the Commissioner.

## B.

The medical evidence in this section is reviewed in chronological order.

### 1.

In July 2005, Dr. Ahmari Shaikh completed an Internal Medicine Consultative Examination and submitted a written report in conjunction with Ms. Cochrane's application for benefits (R. 210-18). In that report, Dr. Shaikh states that Ms. Cochrane reported having diabetes mellitus since 1997, but this condition had been controlled by gastric bypass surgery in December 2004. Dr. Shaikh reported that Ms. Cochrane takes medication that controls her blood sugar levels, "much improved" after the surgery and "less than 130" (R. 210). Dr. Shaikh also reported that Ms. Cochrane complained of heel spurs; intermittent blurring of her vision, sometimes followed by a migraine and fatigue; aches and pains, including some pain across her shoulder (*Id.* at 210-211). Ms. Cochrane

---

[2]"Retinopathy" is defined as non-inflammatory retina disorders, including some that may cause blindness (*see* Merriam Webster's (online) Medical Dictionary).

6

also reported numbness in her hands, as a result of previously diagnosed bilateral carpal tunnel syndrome, for which she had prior surgery in the early 1990s (*Id.*). Dr. Shaikh stated that Ms. Cochrane believed this surgery permitted her to regain approximately ninety percent of her hand functions, but she reported suffering from numbness that limited her ability to work on a computer, cook and grip with her fingers (*Id.* at 211).

Dr. Shaikh's physical examination of Ms. Cochrane in 2005 revealed that she had no difficulty getting on and off the exam table, was sitting comfortably when he entered the room, and was cooperative and oriented (R. 211). At that time, she was 68 and 1/2 inches tall and weighed 217 and 1/4 pounds, having lost approximately 108 pounds after her gastric bypass surgery (R. 210-11).

Dr. Shaikh found that Ms. Cochrane had a grip strength of 4.5/5 bilaterally, and she could make a fist, oppose all fingers to the thumb, and extend the hand bilaterally with normal fine and gross motor skills (*Id.* at 212). Dr. Shaikh also reported that Ms. Cochrane had "difficulty pouring a gallon of water," and "[o]n repetitive movements she develop[ed] numbness" (*Id.*). With respect to neurological impairments, Dr. Shaikh found that she had "slightly decreased" sensation "over the fingers up to the palm bilaterally" (*Id.*). No other impairments were noted.

### 2.

In a medical report dated April 20, 2006, Dr. Mohamed K. Ghumra provided neurological examination results for Ms. Cochrane (R. 255-56). Dr. Ghumra stated that Ms. Cochrane's results were "completely normal except she is areflexic[3] and also has some sensation change in the lower extremity up to the ankle" (R. 255). He also stated that Ms. Cochrane's "[p]osition and vibration

---

[3] "Areflexic" means the absence of reflexes. *See* Merriam-Webster's (online) Medical Dictionary.

sense" were "diminished in the left leg" (*Id.*). Dr. Ghumra provided the following assessment of Ms. Cochrane's neurological condition:

1. Generalized myalgia, pain, and paresthesia, etiology unclear. It may represent fibromyalgia, however, rule out polymyalgia rheumatica, polymyositis or myopathy.[4]

2. Rule out current carpal tunnel syndrome mostly polyneuropathy.[5]

(R. 255). He recommended a blood work-up and an EMG nerve conduction study of the upper and lower extremity (R. 256), based on Ms. Cochrane's complaints of generalized pain, numbness and paresthesia (R. 255).

This EMG was performed on May 24, 2006, and the following results were reported as "abnormal":

1. Moderate bilateral carpal tunnel syndrome, right greater than left.
2. Mild sensorimotor polyneuropathy of the lower extremities.

(R. 259). The report also states that there was "[n]o sign of cervical radiculopathy, myopathy, or anterior horn cell [the remainder of the entry is illegible]" (*Id.*).

---

[4] "Paresthesia" is defined as: "a sensation of tingling, pricking, or numbness of a person's skin with no apparent long-term physical effect." The feeling can be "transient or chronic." *See* en.wikipedia.org/wiki/Paresthesia.

"Polymyalgia Rheumatica" is defined as: "a relatively common cause of widespread aching and stiffness in older adults." *See* www.rheumatology.org.

"Polymyositis" is defined as: "an uncommon connective tissue disease" which is "characterized by muscle inflammation and weakness." The most noticeable characteristic is "weakness of the skeletal muscles, which control movement."

"Myopathy" is defined as: "a muscular disease in which the muscle fibers do not function for any one of many reasons, resulting in muscular weakness. *See* en.wikipedia.org/wiki/myopathy.

[5] "Polyneuropathy" is defined as: "a neurological disorder that occurs when many peripheral nerves throughout the body malfunction simultaneously." *See* en.wikipedia.org/wiki/polyneuropathy.

Thereafter, in handwritten progress notes dated July 10, 2006, Dr. Ghumra noted that Ms. Cochrane complained of limiting pain in her left shoulder, and fatigue from medication she was prescribed (R. 262). Dr. Ghumra wrote that Ms. Cochrane suffered from left rotator cuff dysfunction; fibromyalgia and chronic pain; carpal tunnel syndrome; and polyneuropathy (*Id.*). On July 31, 2006, Dr. Ghumra recommended certain medications and a follow up with Dr. Joshi, the primary care/treating physician for Ms. Cochrane (R. 262). Dr. Joshi's notes from January through July 2006 add only that Ms. Cochrane suffered from a hernia in addition to the conditions noted above (R. 266-68). Dr. Joshi referred her to a surgeon for the hernia, and surgery was performed on December 18, 2006 (R. 277, 279, 285).

**3.**

In November 2006, Dr. Joshi referred Ms. Cochrane to Dr. Scott Mox for an orthopaedic examination related to her left shoulder pain (R. 278). Dr. Mox's examination revealed "no asymmetry or motor atrophy in the left shoulder, and her forward flexion was normal at 90 degrees, and laterally the same" (R. 281). The external rotation, however, was only at about 40 degrees and her internal rotation was "barely to the buttocks" (*Id.*). Ms. Cochrane's "supraspinatus strength" and x-rays showed no "gross osseous abnormalities" (*Id.*). Dr. Mox's assessment was "left shoulder adhesive capsulitis" (*Id.*).[6] Dr. Mox noted that this condition is more common in diabetics than in the general population, and it can be treated with steroids, "vigorous physical therapy," and (as a last option) surgery (*Id.*). At the time of Ms. Cochrane's follow up visit in December 2006, Dr. Mox

---

[6]Adhesive capsulitis is a "global decrease in shoulder range of motion" that is "painful at onset." It is caused by adhesion or sticking of the "shoulder capsule" to the "humeral head." It is a "serious clinical finding." *See, e.g.,* "Adhesive Capsulitis: A Sticky Issue," by L.B. Siegel, M.D., N.J. Coahen, M.D. and E.P. Gall, M.D. (American Family Physician (April 1, 1999)).

9

reported that the steroid injection had not worked to relieve her left shoulder pain, but physical therapy was still to be completed (*Id.*).

### C.

In addition to the medical evidence highlighted by Ms. Cochrane's attorney, we note the following medical evidence of record.

#### 1.

In April 1996, Ms. Cochrane sought care for her diabetes from Dr. Kent McGuire (R. 156, 159). At that time, she reported eye fatigue working with the computer, which was exacerbated when her blood sugar was not controlled (*Id.*). Dr. McGuire referred her to an opthamologist, Dr. Seigle, who stated that eye surgery, which she elected and which was done, would not improve her eye fatigue (R. 164, 166). Based on this report, Dr. McGuire concluded that the eye fatigue and vision blurring was a result of non-insulin dependent diabetes mellitus, which was a "permanent condition" (R. 159). He recommended a four hour/per day limit to computer screen use, as well as more management of blood sugar levels (*Id.*).

#### 2.

In August 2003, insurance records completed by Dr. Shuja N. Valika indicate that Ms. Cochrane had hyperthyroidism, Type II diabetes mellitus and morbid obesity (R. 168-69, 184). In March 2004, Dr. Valika also diagnosed plaintiff with left foot pain (R. 170-72). Ms. Cochrane reported her level of foot pain to be at a level of 7-8 on a scale of 1-10 (with 10 being the maximum severity level) (R. 173). Dr. Valika performed an objective examination and, although his

handwriting is difficult to read, it appears he concluded that Ms. Cochrane had an "antalgic gait" [7] with her "[left] foot inverted bearing excessive weight on lateral border, excessive toe-out also on [left]" (*Id.*). On palpitation, Dr. Valika found that there was "marked pain increase with minimum pressure to left second and third toe . . . interspace at TMT joint" (R. 174). Dr. Valika also wrote that there was "pain increase [to the left] ankle, plantar flexion and toe flexion" (R. 174). She concluded that Ms. Cochrane's pain increased with work, and she would be "unable to participate in" some activity – but we cannot tell what that activity is due to the illegibility of her writing (*Id.*). Dr. Valika summarized her findings, stating that Ms. Cochrane displayed "significant gait deviations, [with] pain increasing after ambulation [more than] 2.5 hours" (R. 175). She recommended exercise to increase length of ambulation time (R. 175).

By April 2004, Ms. Cochrane reported that she was "getting better," and Dr. Valika reported improvement in Ms. Cochrane's level of pain and the length of time she could stand and walk (R. 176). In May 2004, Ms. Cochrane reported that she was "feeling better," and Dr. Valika reported continued improvement; but, Dr. Valika also noted that Ms. Cochrane was still only able to stand and walk more than one hour, but less than four hours (*Id.* at 177).

### 3.

In April 2004, Ms. Cochrane also obtained a report from Dr. Joseph Vitello, who practiced in the Surgery Clinic at the University of Illinois at Chicago Medical Center (R. 192-96). Ms. Cochrane was referred by her treating physician, Dr. Joshi, for gastric bypass surgery (*Id.* at 192-

---

[7]"Antalgic gait" is defined as a form of gait abnormality. It is adopted to "minimize the amount of weight applied to the painful limb or joint and the amount of time that weight is applied. The result is a limp, a decreased single support time for the affected limb, a shortened stride length for the contra lateral limb, and an increased double support time." *See* sprojects.mmi.mcgill.ca/gait/antalgic/intro.asp ("Gait Disorder Project" May 15, 1999).

11

94). At that time, she was measured as 5'10" and 307 pounds. The surgery was recommended and then performed in December 2004 (R. 195). It was successful, resulting in significant weight loss (*i.e.*, 108 pounds) by July 2004 (R. 203-209).

**4.**

In July 2005, Ms. Cochrane was referred by her treating physician, Dr. Joshi, to Dr. Brian L. Heffelfinger, an opthamologist, for a report on her blurred vision after blood glucose levels elevated (R. 220). Dr. Heffelfinger concluded that she had "background diabetic retinopathy" and "open angle glaucoma" (*Id.*). Dr. Heffelfinger reported that Ms. Cochrane's corrected vision was 20/30+ in her right eye and 20/20 in her left eye with refraction, her interocular pressures were normal, as were her pupil reflexes, motility, color vision, depth perception and confrontation vision fields (*Id.*).

**5.**

The DDS performed an RFC evaluation on August 11, 2005 (R. 229-36). The evaluator, Dr. Charles Kenney, found that Ms. Cochrane was capable of performing a full range of medium work with no limitation (R. 230). This included the findings that Ms. Cochrane could lift 50 pounds occasionally and 25 pounds frequently; could stand, walk or sit six hours in an eight hour day; had unlimited ability to push or pull; and had no postural, manipulative or vision limitations (R. 230-32). Dr. Kenney wrote that his conclusions were not significantly different then conclusions about restrictions from other treating or examining sources (R. 235).

**6.**

In October 2005, Ms. Cochrane was referred by Dr. Joshi for an outpatient x-ray of her cervical spine at Sherman Hospital (R. 238-241). The impression taken was normal, including on

flexion and extension (R. 238). The x-ray technician found no abnormalities or degenerative changes (*Id.*).

7.

In December 2005, Ms. Cochrane was referred to Dr. Joel Stolar for examination of her blurred vision (R. 251-54). Dr. Stolar noted corrected vision in both eyes with a normal external eye exam and a "normal" conjunctiva and sclera "on the right" (R. 251). Sr. Stolar noted that Ms. Cochrane had been on glaucoma medication "temporarily," but his report found no retinopathy associated with her diabetes, and no glaucoma (R. 252).

III.

In a written opinion, dated March 23, 2007, the ALJ applied the sequential five-step analysis and found Ms. Cochrane not disabled (R. 14-19). Ms. Cochrane challenges the ALJ's determination at every level of the analysis except for step one, where the ALJ found that Ms. Cochrane had not engaged in substantial gainful activity (R. 15). Plaintiff argues that the ALJ: (1) erred in his step two analysis because, even though he found that Ms. Cochrane suffered from multiple severe impairments (diabetes mellitus, history of gastric bypass surgery, hypothyroid, hernia, and left shoulder arthritis), he failed to consider those impairments in combination with other conditions the ALJ did not find severe (Pl.'s Mem. at 7-8); (2) erred at step three for a number of reasons (which we address below) (*Id.* at 8-11); (3) erred in making the RFC determination (*Id.* at 11); (4) erred in finding that Ms. Cochrane's testimony concerning her limitations was not credible (*Id.* at 12); and (5) erred in the step five determination that Ms. Cochrane could perform a significant number of jobs in the national economy (*Id.* at 13).

At the outset, we reject the step two challenge. Despite plaintiff's criticism that the ALJ should have done more, the fact remains that the ALJ found for Ms. Cochrane at step two. The Seventh Circuit has held that "[t]he first two steps involve threshold determinations." *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). As we have previously held, "the minimal articulation standard does not require the ALJ to cite and discuss every piece of evidence at this threshold step, when the ALJ's finding was in plaintiff's favor." *Morgan v. Astrue*, No. 07 C 1741, 2009 WL 650364, *8 (N.D. Ill. Mar. 9, 2009). In that decision, we followed a line of authority holding that "as long as the ALJ proceeds beyond step two, no error can result from that analysis." *Id.* (citations omitted); *see also Carrillo v. Astrue*, No. 08 C 1612, 2009 WL 805402, *6 (N.D. Ill., Mar. 26, 2009). We will do so here as well.

That said, we do find that there are shortcomings in the ALJ's analysis at step three and in determining Ms. Cochrane's RFC that require a remand. We address the step three and RFC issues in turn.

### A.

At step three, the ALJ found that Ms. Cochrane's severe impairments did not meet or equal Listing 1.02 for major dysfunction of a joint, or Listing 9.08 for diabetes mellitus (R. 16). In making that finding, the ALJ discussed Ms. Cochrane's history of diabetes and blurred vision, obesity, hernia, left upper extremity problems, carpal tunnel syndrome and fibromyalgia. We find a number of deficiencies in his analysis.

*First*, the ALJ did not identify the specific requirements for either Listing 1.02 or Listing 9.08, nor did he explain why he found that the evidence failed to show that Ms. Cochrane's severe impairments met or equaled those listings. In failing to do so, the ALJ failed to provide an "accurate

and logical bridge from the evidence to his conclusion." *Steele*, 290 F.3d at 941 (quoting *Dixon*, 270 F.3d at 1176).

*Second*, in his step three analysis, the ALJ consistently discussed Ms. Cochrane's conditions in connection with what functional limitations they did (or did not) impose. He noted that Ms. Cochrane's mild neuropathy in her left leg "has not been shown to cause any functional limits"; that her vision problem "limits her exposure to computers"; and, that her upper "left extremity problems . . . would limit her overhead reaching and lifting with the left [non-dominant] upper extremity" (R. 16). A discussion of the functional limitations that Ms. Cochrane may have is, of course, appropriate and required for an RFC analysis. However, it is out of place in the step three analysis of whether severe impairments meet or equal a listing. At that stage of the analysis, the ALJ is limited to review of objective medical evidence. *See* 20 C.F.R. § 404.1529(d)(3) (at step three, SSA will not substitute testimony about a physical symptom, such as pain, for objective medical evidence of that symptom). By intermixing an assessment of the medical evidence with assessments of their physical impact as part of the step three analysis, we cannot be confident that the ALJ conducted the step three analysis in the appropriate manner.

*Third*, certain portions of the ALJ's step three discussion of Ms. Cochrane's severe (and other) impairments misstate or disregard medical evidence in the record. After stating at step two that Ms. Cochrane had a severe impairment of "left shoulder arthritis" (R.15), at step three the ALJ casually labeled that condition as "left upper extremity problems" (R.16). Neither characterization tracks the medical diagnosis in the record, which stated that the condition was left adhesive capsulitis (R. 281). We cannot say that this mislabeling was without significance. Left upper extremity problems do not constitute a medical finding that can be compared to a Listing requirement, which

is necessary to find step three satisfied. *See* 20 C.F.R. § 404.1529. Moreover, arthritis is a generic label that refers to inflammation of one or more joints, resulting in pain or limited movement. *See* Merriam-Webster's (Online) Medical Dictionary. By contrast, adhesive capsulitis is a specific diagnosis that reflects a "serious clinical finding," which is caused by sticking of the shoulder capsule to the humeral head that is painful and results in a "global decrease in shoulder range of motion." "Adhesive Capsulitis: A Sticky Issue," L.B. Siegel, M.D., N.J. Coahen, M.D. and E.P. Gall, M.D. (American Family Physician (April 1, 1999)). The ALJ's inconsistency in how he referred to the condition within his opinion, and the discrepancies between his characterization of the condition and the medical diagnosis, do not allow us to determine that the ALJ accurately assessed Ms. Cochrane's shoulder condition during the step three analysis.

In other respects, the ALJ's step three discussion misstates the medical record. The ALJ found that there was "no actual diagnosis" of fibromyalgia (R. 16). However, in his April and July 2006 reports, Dr. Ghuma diagnosed plaintiff as having fibromyalgia (R. 255, 262-63). Perhaps the ALJ found this diagnosis to be undermined because there was no "trigger point report" of the condition (R. 16). If so, then the ALJ should have explained why the absence of such a report was significant, rather than stating that no diagnosis of fibromyalgia was made. The ALJ also should have explained why the EMG report between Dr. Ghuma's April and July 2006 reports failed to provide support for the diagnosis.

The ALJ's finding that there was no objective evidence of carpal tunnel syndrome (R. 16) also misstates the record. In making that finding, the ALJ cited Dr. Ghuma's report of his neurological examination in April 2006 (R. 255-56). The ALJ ignored that the EMG test that Dr. Ghuma ordered, and that was performed in May 2006, found that Ms. Cochrane had "[m]oderate

16

bilateral carpal tunnel syndrome, right [her dominant hand] greater than left" (R. 259). The ALJ also ignored that, in light of this test, in June and July 2006 Dr. Ghuma diagnosed Ms. Cochrane to have carpal tunnel syndrome (R. 262-63). An ALJ is not allowed to simply disregard medical evidence that is contrary to his findings. *Indoranto*, 374 F.3d at 474. Again, to the extent that the ALJ wished to reject the medical finding of carpal tunnel syndrome, he was required to explain why; it was not sufficient to simply ignore that finding.

While plaintiff raises other criticisms at step three, we have identified the particular ones that in our judgment require a remand. On remand, the ALJ is free to revisit other findings as well. In addition, the ALJ must take care to consider all impairments and conditions that he finds on remand not only individually, but also in combination with one another in order, to properly make the step three determination. The ALJ also must show the path between the evidence and his determination of whether Ms. Cochrane meets or exceeds a Listing.[8]

## B.

The ALJ found that Ms. Cochrane has the RFC to perform medium work, except for overhead reaching or lifting with her left upper extremity or more than occasional computer work (R. 16). As part of that finding, the ALJ found that Ms. Cochrane would lift and carry 50 pounds occasionally and 25 pounds frequently, and could stand or walk at least six hours in an eight-hour day (*Id.*). In making those findings, the ALJ cites at length boilerplate language concerning the

---

[8] Plaintiff criticizes the ALJ for declining to attribute claims of fatigue to Ms. Cochrane's diabetes, which can cause fatigue (Pl.'s Mem. at 10). But, proving that Ms. Cochrane has a condition does not alone prove that she suffers from all possible effects of the condition. Here, plaintiff points to no record evidence (and we have found none) that any doctors attributed Ms. Cochrane's complaint about fatigue to diabetes. To the contrary, Dr. Shaikh's July 2005 report indicates that Ms. Cochrane attributed the onset of fatigue to her gastric bypass surgery in December 2004 (R. 210).

Plaintiff also says the ALJ erred in failing to find that Ms. Cochrane suffered from retinopathy (Pl.'s Mem. at 8). We find no error in the ALJ's handling of that issue.

factors to consider in an RFC analysis. But, the ALJ does not cite to the State Agency's RFC evaluation (R. 229-36) or to any other medical evidence.

We note that the State Agency's RFC stated that Ms. Cochrane could perform medium work without limitations. We thus expect that the limitations that the ALJ added to the medium work RFC were a *sub silentio* effort to account for Ms. Cochrane's left shoulder capsulitis (R. 281), and for the medical evidence that her blurred vision was a permanent condition that required a limitation on her computer use (*Id.* at 159). That said, the ALJ did not address other medical evidence that could affect Ms. Cochrane's RFC. He did not address how capsulitis or rotator cuff dysfunction, as Dr. Ghuma called it (R. 262), might affect Ms. Cochrane's ability to lift, carry, push or pull weight. Nor did he consider Dr. Shaikh's report that Ms. Cochrane experienced numbness in her hands with repetitive movements, and had difficulty pouring a gallon of water (R. 212). Those are factors that may affect Ms. Cochrane's ability to lift weight or to use her hands for gross or fine manipulation. Finally, the ALJ did not consider Dr. Valika's report on pain and limitations that Ms. Cochrane said she experienced when walking (R. 176-177).

In this opinion, we do not hold that the ALJ was required to adjust Ms. Cochrane's RFC based on this additional evidence. We do hold that the ALJ was not entitled to simply disregard that evidence. It is for the ALJ to determine in the first instance – and to explain – what conditions are established in the evidence, and what limitations those conditions impose. But the ALJ must do so upon considering all the evidence that might suggest limitations on Ms. Cochrane's physical capabilities. We remand the case so that the ALJ may do so.[9]

---

[9] In light of our decision to remand, we need not address plaintiff's challenges to the ALJ's credibility determination, his step four finding (which plaintiff says incorrectly labels Ms. Cochrane's past relevant work as "too heavy, or at least semi-skilled" (R. 18)), or his step five finding (which plaintiff says is also based on errors at step two

18

## CONCLUSION

For the foregoing reasons, we grant plaintiff's motion for summary judgment (doc. # 34) and deny the Commissioner's motion for summary affirmance (doc. # 38). The case is remanded for further proceedings consistent with this ruling. The case is terminated.[10]

ENTER:

*[signature]*

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: December 30, 2009

---

and in the RFC determination) (Pl.'s Mem. at 11-13). Those are all matters that the ALJ will have the opportunity to consider on remand.

[10] Although not raised by plaintiff, we note that during the hearing there were certain comments by the ALJ and by plaintiff's counsel (who was different than her counsel in this review) that could be viewed as demeaning or offensive to Ms. Cochrane or her family and that, on reflection, we are sure the ALJ and prior counsel would agree should not have been made (R. 312-13, 329). We do not view these comments as suggesting a lack of impartiality, as was the case in *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). Nonetheless, we respectfully suggest to the ALJ that he exercise care to prevent comments that would insult the participants in the hearings, and thus undermine the dignity of those important legal proceedings.